FILED
SUPERIOR COURT
OF GUAM

2024 MAY 30 PM 5: 12

CLERK OF COURT

BY:_____

# IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM, ) CRIMINAL CASE NO. **CF0375-22**
) GPD REPORT NO. 22-13453 / 22-14741
)
)
vs. )
)
)
**FRANKY F. RUFES,** ) DECISION AND ORDER RE.
aka Franky Aruchy, ) DEFENDANT'S MOTION TO
DOB: 08/29/1993 or 02/28/1993 ) SUPPRESS
)
Defendant. )
_____ )

## <u>INTRODUCTION</u>

This matter came before the Honorable Maria T. Cenzon upon Defendant Franky F. Rufes's ("Defendant or Franky Rufes") Motion to Suppress ("Motion or Motion to Suppress"). The People of Guam ("the People") are represented by Assistant Attorney General Kristine B. Borja. Defendant is represented by Terrence E. Timblin. Defendant and counsels were present at the suppression hearing on December 21, 2023, and the continued suppression hearing on March 1, 2024. Following the hearings, the Court took the matter under advisement pursuant to CVR 7.1(e)(6)(D) of the LOCAL RULES OF THE SUPERIOR COURT OF GUAM and Administrative Rule No. 06-001. After considering the pleadings on file and having heard oral arguments, and after reviewing the applicable statutes and case law, the Court now issues this Decision and Order **<u>DENYING</u>** Defendant's Motion to Suppress.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. The Allegations in the Magistrate's Complaint and Indictment

Defendant is charged with the following offenses: Possession of a Schedule II Controlled Substance with Intent to Deliver (As a First Degree Felony), Possession of a Firearm without a Firearm Identification Card (As a Third Degree Felony), Possession of an Unregistered Firearm (As a Third Degree Felony), and Family Violence (As a Third Degree Felony) with a Special Allegation: Possession and Use of a Deadly Weapon in the Commission of a Felony, that is, Family Violence (As a Third Degree Felony). *See* Magistrate's Compl. (June 3, 2022); Indictment (June 14, 2022.).[1]

The facts relevant to this Motion are attendant to the Possession of a Schedule II Controlled Substance and Possession of a Firearm without Firearm Identification Card and Possession of an Unregistered Firearm and are as follows: On or about June 1, 2022, Defendant was sitting in the driver's seat of a silver Toyota Camry parked at the Bank of Guam parking lot in Harmon. *Amend. Decl. to Magistrate's Complaint.* Responding to GPD Dispatch of a possible sighting of a suspect wanted in several active criminal investigations, police officers approached the vehicle and the Defendant, who was unable to produce his driver's license to confirm that he was not, in fact, the individual the police thought him to be. There was a passenger seated next to the Defendant in the vehicle. When asked for the vehicle's documents, the Defendant, using his left hand, reached over towards the passenger "while his right arm appeared to be stuck against the center console." *Amend. Decl.* at 1. Apparently finding the maneuver alarming, the officer then ordered him to exit his vehicle. *Id.; Cont'd Hrg. on Mot. to Suppress on 3/1/24* at 9:51:16 AM to 9:53:15 AM (Mar.

---

[1] The allegations relating to the Family Violence (as a Third Degree Felony) charge are not relevant to the Motion to Suppress so the factual basis for the charge is not discussed in this Decision and Order.

1, 2024).[2] "When the Defendant stepped out, a clear plastic bag containing suspected methamphetamine dropped on to the pavement. The Defendant confirmed for the officer that it was [methamphetamine]." *Amended Decl.* at 1. Defendant was then arrested, and the suspected substance tested presumptively positive for methamphetamine. *Id.*

After Defendant's arrest, officers conducted a search of the vehicle, during which they found a pistol "wedged but visible" between the driver's seat and center console. *Id.* Additionally, inside a bag located on the passenger floorboard, officers found "33 small, clear, apparently used bags, two same-type bags containing a white crystalline substance suspected to be methamphetamine, and a glass pipe." *Id.* These items tested presumptively positive for methamphetamines. In two different bags, officers also found approximately $2,643.00 in U.S. currency, as well as another $866.00 in U.S. currency within Defendant's wallet. Defendant allegedly admitted that all the methamphetamines found in the vehicle belonged to him. *Amend. Decl.* at 2.

## B. Defendant's Motion to Suppress

On January 4, 2023, Defendant filed the instant Motion which the People opposed.[3] Over the course of two evidentiary hearings, the People presented testimony of the police officers who were involved in the June 1, 2022, incident leading to the Defendant's arrest: GPD Officers Matias Lizama ("Lizama"), Arthur Munier ("Munier") and Javin Cruz ("Cruz") testified on December 21, 2023, and Officer Steven Arceo ("Arceo") and Sergeant Efraim Amaguin ("Amaguin") testified at the continued hearing on March 1, 2024. The following account of the June 1, 2022, incident was testified to by these witnesses:

---

[2] The hearing on the Motion to Suppress shall be referred to herein as "Suppression Hearing" when cited.
[3] On January 19, 2023, the People filed its Opposition to Defendant's Motion. On February 24, 2023, Defendant filed his Reply to the People's Opposition.

While off-duty, Officer Lizama spotted a silver Toyota Camry matching the description of a vehicle belonging to Losal Phaynid, a suspect in a number of on-going criminal investigations, at the San Jose Supermarket parking lot in Maite. *Suppression Hrg. of 12/21/23* at 10:53:00 AM – 10:56:54 AM (Dec. 21, 2023). He also observed a male who matched Losal Phaynid's description enter the vehicle and exit the parking lot onto Route 8. *Id.* at 10:54:23 AM. Sometime later, Lizama saw the same vehicle traveling along Route 16 adjacent to the Bank of Guam in Harmon – the officer was able to identify the vehicle again because it matched the suspect's vehicle's description and had the same license plate. *Id.* at 10:54:30 AM to 10:55:05 AM. Officer Lizama further observed the vehicle pull into the Bank of Guam parking lot, so he contacted Tumon Precinct while also pulling into the parking lot adjacent to the Bank of Guam to continue to eye the vehicle. *Id.* at 10:55:10 AM. He continued to report his observations to desk watch, but did not engage or interact with the suspect. *Id.* at 10:55:40 AM. Upon on-duty officers arriving at the scene, Officer Lizama left without any interaction. *Id.* at 10:55:50 AM to 10:56:30 AM.

Sergeant Amaguin testified that at 8:00 p.m. on June 1, 2022, he responded to a call from police dispatch about the suspected vehicle reported by Officer Lizama. *Cont'd Suppression Hrg. on 3/1/24* at 9:45:27 AM, 9:49:00 AM – 9:49:04 AM (Mar. 1, 2024). Amaguin was already on Route 16 at the time of the call and proceeded to the Bank of Guam parking lot in Harmon where he observed the vehicle facing north towards the Harmon Loop Hotel. *Id.* at 9:47:15 AM. He testified that when he approached the vehicle, he observed the engine running, and he observed the suspect in the driver's seat watching a video on his phone. *Id.* at 9:48:05 AM. Amaguin knocked on the driver-side window and asked the driver to roll down the window, and when he asked the driver for identification, the driver identified himself as Franky Rufes. *Id* at 9:48:25 AM. He testified that it was dark, and he could not readily recognize the driver. *Id.* at 9:49:00. When

Amaguin asked for a license and registration, Defendant said that he did not have a driver's license, although he admitted that he drove to the location at the Harmon Bank of Guam. *Id.* at. 9:49:49 AM; 9:50:00 AM – 9:50:16 AM ("He had no other form of identification on him that would validate his claim that he was in fact Frankie Rufes.").

Around this time, Officers Munier and Cruz arrived on the scene. *Id.* at 9:50:20 AM. Officer Munier testified that he was with Officer Cruz when he received a report over the radio that Sergeant Amaguin encountered a silver or grey Camry that was allegedly operated by Losal Phaynid at the Bank of Guam parking lot in Harmon. *Suppression Hearing* at 11:00:30 AM (Dec. 21, 2023). Upon arriving at the parking lot, Munier observed Amaguin's police vehicle parked adjacent to the suspect's vehicle, and Sergeant Amaguin standing next to the suspect's driver's door and no one else was around the vehicle. *Id.* at 11:01:20 AM. Munier testified that he heard Amaguin speaking to the driver "saying something to the effect of 'What are you doing?' or something like that and he had asked him to step out of the car." *Id.* at 11:02:35 AM to 11:02:44 AM. Munier observes Defendant step out of the vehicle and notices a baggie drop immediately to the ground as Defendant alighted from the car. *Id.* at 11:03:07 AM. Munier testified that he could easily identify the baggie as one likely to contain methamphetamines because he often encounters the same type of container in his line of work. *Id.* at 11:05:20 AM.

Sergeant Amaguin testified that he had safety concerns when approaching the vehicle because the officers were possibly in the presence of a burglary suspect, and such scenarios are often volatile situations. *Cont'd Suppression Hrg.* at 9:50:50 AM (Mar. 1, 2024). In answering the question: "Why did you have [Defendant] exit the vehicle?" Amaguin explained:

> [Defendant] was behaving in a manner that was causing me alarm. He was rigid, his right forearm was wedged against the console, and when I asked him for his vehicle documents, he reaches over to his passenger, who was in possession of the stack of documents, with his left hand, but he did so in a manner that caused even

*more* alarm. His movement was excessive while still maintaining his right forearm against the center console. As soon as he reached over, I told him stop and I ordered him to get out of the car. *** He had to shift his entire body, as though trying to conceal … as though trying to prevent me from seeing what he had against his right arm. I ordered him to stop what he was doing and exit the car.

*Id.* at 9:51:35 AM – 9:53:16 AM.

Amaguin testified that as the Defendant exited the vehicle, a small baggie of suspected methamphetamine fell onto the pavement. *Id.* at 9:53:20 AM. When he asked the Defendant if that was methamphetamine, the Defendant responded, "Yes, it is ice." *Id.* at 9:53:30 AM; *Suppression Hrg. on 12/21/24* at 11:06:00 to 11:06:11 AM.

Munier similarly testified that after Defendant stepped out of the vehicle, a baggie fell from what he assumed to have been Defendant's lap and so Rufes was moved away from the driver's side door of the car. Munier's testimony is that he then looked through the open driver door and he could see a silver pistol in the vehicle situated between the center console and the driver's seat with the gun handle sticking out. *Suppression Hrg. on 12/21/24* at 11:06:00 AM to 11:06:44 AM ("It was very visible."). At that point, Munier asked the Defendant if he possessed a firearms ID, to which the Defendant replied that he did not. *Id.* at 11:07:20 AM. Based upon the Defendant admitting to the contents of the fallen baggie containing methamphetamine and admitting to not owning a firearms ID despite having a firearm in the car, Officer Munier then placed the Defendant under arrest. *Id.* at 11:07:40 AM. Following his arrest, Defendant was placed in the backseat of Munier's patrol vehicle, and Munier testified that it was then that he advised the Defendant of his *Miranda*[4] rights, which the Defendant acknowledged and waived. *Id.* at 11:07:50 AM. Munier

---

[4] *Miranda v. Arizona*, 384 US 436 (1966) (Under the Fifth Amendment, any statements that a defendant in custody makes during an interrogation are admissible as evidence at a criminal trial only if law enforcement told the defendant of the right to remain silent and the right to speak with an attorney before the interrogation started, and the rights were either exercised or waived in a knowing, voluntary, and intelligent manner.).

testified that Defendant indicated to him that there were more methamphetamine bags in the vehicle and a substantial amount of cash – the Defendant also indicated that he owned the drugs. *Id.* at 11:08:00 AM. According to Sergeant Amaguin, the entire incident on June 1, 2022, occurred very quickly and may have transpired over the course of five minutes. *Cont'd Suppression Hrg.* at 10:04:50 AM (Mar. 1, 2024).

By his Motion, Defendant seeks suppression of all evidence seized resulting from the events described above, arguing that the singular purpose of the stop at the Bank of Guam parking lot was to determine whether Losal Phaynid was within the vehicle, and upon determining that the driver was *not* Losal Phyanid, there was no justification for the prolonged encounter with the police and any subsequent discovery of contraband by the police should be suppressed. *Id.* The People argue that the stop was justified – the Defendant did not have any identification despite verbally identifying himself as Franky Rufes to confirm that he was *not* the suspect in several crimes for whom police were looking. *People's Opp.* at 3. Further, the fact that Rufes did not have a driver's license and that he had driven to the location was a violation of 16 GCA §§ 3101 (a), (c), and 9108 (Operation of Motor Vehicle Without a Valid License), justifying the officer's prolonged encounter after the Defendant identified himself. *Id.*

## DISCUSSION

The Fourth Amendment to the United States Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, [and] shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. In short, the Fourth Amendment protects against unreasonable searches and seizures and is made applicable to Guam by 48 U.S.C.A. § 1421

b(c) of the Organic Act of Guam. *People v. Yerten,* 2021 Guam 8 ¶ 17 (citing *People v. Johnson,* 1997 Guam 9 ¶ 4) (internal citations omitted).

## I.     The initial investigatory stop and the seizure and arrest of Defendant were not unconstitutional because police had probable cause to believe that the Defendant had committed a crime.

Seizures can take the form of both investigative stops and formal arrests, as in either situation a reasonable person would not feel able to decline the Officer's requests or otherwise immediately terminate such encounters. *See People v. Chargualaf,* 2001 Guam 1 ¶ 17. For investigative stops, police may briefly detain someone if they have a reasonable suspicion of unlawful activity. *See Terry v. Ohio,* 392 U.S. 1, at 10 (1968). For formal arrests, police must have "probable cause to believe that the suspect has committed a crime." *Id.* at 10. Both "reasonable suspicion" and "probable cause" are judged by a totality of the circumstances, and those beliefs must be based on "specific reasonable inferences" supported by articulable facts rather than merely inadequate guesswork. *Id.* at 27.

The Guam Supreme Court has declared that a traffic stop is valid if officers had a reasonable suspicion of criminal conduct. *People v. Mansapit,* 2016 Guam 30 ¶ 13 (citing *Terry v. Ohio,* 392 U.S. 1, 21). In *Mansapit,* the Guam Supreme Court instructed:

> Reasonable suspicion entails "some minimal level of objective justification" for making a stop, but considerably less than the level of suspicion required for probable cause. *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado,* 466 U.S. 210, 217 (1984)). This determination "is dependent upon both the content of information possessed by police and its degree of reliability." *People v. Johnson,* 1997 Guam 9 ¶ 5 (quoting *Alabama v. White,* 496 U.S. 325, 330 (1990)). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" *United States v. Lopez–*

*Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).[5]

Here, Sergeant Amaguin had reasonable suspicion to perform an investigative stop at the time of the incident. GPD received reliable information from Officer Lizama that a vehicle and an individual matching the description of Losal Phaynid – a suspect in several active criminal investigations – were seen at the San Jose Supermarket and later was parked at the Harmon Bank of Guam parking lot. *Suppression Hrg.* at 10:53:50 AM to 10:55:10 AM (Dec. 21, 2023). GPD dispatch then relayed the information and Sergeant Amaguin responded to the call to investigate whether a suspect in an active criminal investigation could be in the vehicle, thus justifying the investigative stop. Although the Defendant identified himself as Franky Rufes and not Losal Phaynid, the Defendant failed to provide identification to confirm his identity. The failure to provide identification further justified Sergeant Amaguin's continued encounter with Defendant since Amaguin could not confirm Defendant's identity was *not* that of Losal Phaynid.

Additionally, Officer Munier had probable cause to formally arrest the Defendant. As stated above, the Defendant identified himself as Franky Rufes but was unable to provide Sergeant Amaguin with a driver's license, meaning he operated the vehicle without a valid license. Although not in and of itself an arrestable offense, when the Defendant was ordered to and stepped out of the vehicle due to his suspicious actions, a small baggie of suspected methamphetamine fell on the pavement, which the Defendant himself confirmed as methamphetamines. Furthermore, after Defendant was moved away from the vehicle, Munier observed through the open car door the handle of a pistol which was wedged between the driver's seat and the middle console, and the

---

[5] *People v. Mansapit*, 2016 Guam 30, ¶ 13. The outcome in *Mansapit* is distinguishable from here because there was no evidence presented by the People during the suppression hearing in that case and Mansapit submitted a recording of the 9-1-1 call, the contents of which did not support the officers' actions in that case. Here, the Court finds the testimony of the officers to be reasonable and their actions founded upon reliable information that an illegal act had occurred which was the subject of an active investigation.

Defendant confirmed that he did not have a valid firearms identification card permitting him to possess the firearm. Therefore, based upon the totality of the circumstances: Defendant was unable to confirm that he was *not* the suspect in active criminal investigations that the officers were looking for; he did not possess a valid driver's license to drive the vehicle; his furtive and suspicious movements alarmed the police officers such that they were compelled to command him out of the vehicle for officer safety; the baggie containing methamphetamines falling onto the ground as he alighted from the vehicle; and the possession of a pistol without a valid firearms identification card, officers had sufficient probable cause to arrest the Defendant.

**II.     The search following Defendant's arrest was constitutional as an exception to the constitutional prohibition of unreasonable searches.**

Like seizures, searches must too be reasonable under the Fourth Amendment. Searches implicate an individual's Fourth Amendment rights when they cover areas in which the individual has a "reasonable expectation of privacy." *See Oliver v. U.S.* 466 U.S. 170, at 171 (1984). If the individual does have a reasonable expectation of privacy, police officers must generally obtain a warrant before conducting a valid search. *See People v. Chargualaf,* 2001 Guam 1 ¶ 14. Warrantless searches are otherwise presumed unreasonable. *See Katz v. U.S.,* 389 U.S. 347,357 (1967).

However, there are several situations where police may conduct a search without first obtaining a warrant. One such exception is a "search incident to a lawful arrest." *See Arizona v. Gant,* 556 U.S. 332, 338 (2009). Under that exception, "police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351.

Here, the search of the vehicle following Defendant's arrest was lawful under *Gant*. Officers could have searched the vehicle as a "search incident to a lawful arrest." *See Id.* GPD may not invoke the first prong of *Gant* because the Defendant was secured in Officer Munier's vehicle at the time of the search.

However, the second prong of *Gant* is satisfied because GPD had developed probable cause that more methamphetamine was in the vehicle. Following the reading of Defendant's *Miranda* rights, Officer Munier testified that the Defendant waived those rights and confirmed the existence of more bags of methamphetamine in the vehicle. *Suppression Hrg.* at 11:08:00 AM (Dec. 21, 2023. Therefore, given that Defendant was arrested for possession of methamphetamine, and the Defendant confirmed to officers that more methamphetamines could be found in the vehicle, GPD's search of the vehicle was lawful.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Suppress. GPD's initial investigatory stop and Defendant's seizure and arrest were both constitutional because GPD had probable cause to believe Defendant had committed a crime. Further, the search of Defendant's vehicle constitutes a "search incident to a lawful arrest" and physical evidence seized during the search is therefore admissible.

**SO ORDERED** this _____ MAY 3 0 2024 _____.

**HONORABLE MARIA T. CENZON**
Judge, Superior Court of Guam